UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CIERA DANIEL,

      Plaintiff,                          Civil Action No. 11-13614

v.                                 HON.  STEPHEN J. MURPHY, III
                                 U.S. District Judge
                                 HON. R.  STEVEN WHALEN
COMMISSIONER OF SOCIAL         U.S. Magistrate Judge
SECURITY,

      Defendant.
_____/

## REPORT AND RECOMMENDATION

      Plaintiff Ciera Daniel brings this action under 42 U.S.C. §405(g) challenging a final decision of Defendant Commissioner denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Social Security Act. Both parties have filed summary judgment motions which have been referred for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  For the reasons set forth below, I recommend that Defendant's Motion for Summary Judgment [Doc. #13] be GRANTED, and that Plaintiff's Motion for Summary Judgment [Doc. #10] be DENIED.

## PROCEDURAL HISTORY

      On April 24, 2008, Plaintiff filed an applications for DIB and SSI, alleging an disability onset date of August 26, 2003 (Tr. 132-138).  After the initial denial of the claim, Plaintiff requested an administrative hearing, held on March 2, 2010 in Chicago, Illinois

before Administrative Law Judge (ALJ) Paul Armstrong.  Plaintiff, represented by attorney

Mona Gockel, testified by video conference (Tr. 6-36), as did Plaintiff's mother, Theresa

Thompson (Tr. 57-65). Vocational Expert ("VE") Diane Regan also testified (Tr. 36-40).

On March 18, 2010, ALJ Armstrong found Plaintiff not disabled (Tr. 87).  On June 21, 2011,

the Appeals Council denied review (Tr. 1-5).  Plaintiff filed for judicial review of the final

decision on August 18, 2011.

## BACKGROUND FACTS

Plaintiff, born August 27, 1986, was 23 when the ALJ issued his decision (Tr. 87,

132). She graduated from high school and worked formerly as a cashier (Tr. 157, 163). She

alleges disability as a result of a bipolar disorder (Tr. 156).

### A.    Plaintiff's Testimony

Plaintiff testified that she had not worked since being terminated from a cashier

position in December, 2007 (Tr. 23).  She alleged that holding a job necessitated medication

changes which made her alternately sleepy and restless (Tr. 24).  She reported that in the

past, she sustained a head injury but denied recent seizures (Tr. 26).

Plaintiff denied that she had a current boyfriend, indicating that she felt stigmatized

by her bipolar diagnosis (Tr. 26).  She testified that recent therapy notes stating that she had

a current boyfriend were referring to a platonic rather than romantic friendship (Tr. 27).  She

reported that she flunked the written portion of the test for a driver's license the previous

summer (Tr. 28).  She stated that a recent therapist assigned to her at a local mental health

facility had not helped her cope with her diagnosis, but that in contrast, her psychiatrist, Dr.

-2-

Shah, was concerned with her condition (Tr. 30). She disputed counseling records showing that she had missed seven appointments, stating that to the contrary, it was her therapist who missed scheduled appointments (Tr. 30).

Plaintiff testified that she currently lived with her mother and stepfather (Tr. 31). She opined that concentrational problems would prevent her from returning to her work as a cashier, adding that before her most recent termination, she had been fired from two other positions after her cash drawer (which had been used by other employees) "came up short" (Tr. 32). She opined further that she would be unable to perform any food service positions because she became easily "stressed out" (Tr. 33). She acknowledged, in effect, that her condition was currently stable, attributing her current condition to the consistent use of psychotropic medication (Tr. 33). She reiterated that the medication made her both sleepy and restless, stating that she would be unable to perform full-time work because of medication side effects (Tr. 34). In response to Plaintiff's claim that she slept most of the time, the ALJ noted that a third party report stated that she got up in the afternoon, watched television for the rest of the day, and went to bed at 3:00 or 4:00 a.m. (Tr. 35).

Plaintiff denied significant interaction with others outside her household, alleging that recent therapy notes stating that she had a current boyfriend actually referred to a long ended high school relationship (Tr. 37). She stated that she had engaged in verbal altercations with supervisors, customers, or coworkers in all three of her jobs (Tr. 40-41). She stated that at the age of either 18 or 19, she attempted suicide on two occasions (Tr. 45). Plaintiff testified that her mother also believed that mental problems prevented Plaintiff from working (Tr. 48).

-3-

She reported that in the past year, her stepfather presented her with an eviction notice but that her mother intervened on her behalf (Tr. 49). Plaintiff alleged that she lacked the focus to follow the plot of a full length movie (Tr. 52).

### B.    Plaintiff's Mother

Plaintiff's mother, Theresa Thompson ("Thompson") opined that Plaintiff's medicine, taken at "therapeutic" doses, made her daughter too sleepy to work (Tr. 57). She reported that as a child, her daughter would throw tantrums then go into a "coma like sleep" then "wake up as if nothing happened" (Tr. 59). Thompson testified that her daughter received a diagnosis of a mental health condition after attempting suicide in 11th grade (Tr. 60). She stated that her husband had attempted to evict Plaintiff the prior year because Plaintiff was "kind of volatile and belligerent" (Tr. 60).

### C.    Medical Evidence

#### 1. Treating Sources

Over the course of July, 2003, Plaintiff was hospitalized three times following an attempted suicide after breaking up with a boyfriend (Tr. 237). Harbor Oaks Hospital treatment records state that Plaintiff had been getting good grades up until the end of the recent school year (Tr. 237). Her attention and concentration were deemed "good" with above average intelligence (Tr. 219, 238). She was diagnosed with depression and an oppositional defiant disorder and prescribed Seroquel and Trileptal (Tr. 210). She received an initial GAF of 30 (Tr. 238) and a GAF of 55 at the time of her third discharge on August

-4-

4, 2003[1] (Tr. 210).

In January, 2005 Plaintiff stated that medication prevented her from feeling depressed and allowed her to focus on her school work (Tr. 247). Intake notes from Northeast Guidance Center in May, 2005 state that Plaintiff exhibited goal oriented speech and was fully oriented and able to recall immediate, recent, and remote data (Tr. 253). Plaintiff stated that she wanted to start college and go to law school (Tr. 252). She reported working at McDonald's 20 to 30 hours a week since August, 2004 (Tr. 246, 251). She denied any medication side effects or the need for therapy (Tr. 247, 249).

In March, 2007, imaging studies of the chest, brain, pelvis, and spine were negative for abnormalities (Tr. 259-263). The following month, Plaintiff was readmitted for psychiatric hospitalization after attempting to leave the house in pants and a robe (Tr. 270, 408). She was restrained and sedated after becoming agitated (Tr. 276). Plaintiff was hostile and combative upon admittance but attended group therapy and was encouraged to work on her coping skills (Tr. 270). She was admitted with a GAF of 20 and released with a GAF of 50[2] (Tr. 270). She was discharged in stable condition (Tr. 271). At a therapy session later

---

[1]

A Global Assessment of Functioning ("GAF") score of 21-30 indicates that "behavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment OR inability to function in almost all areas. American Psychiatric Association." *Diagnostic and Statistical Manual of Mental Disorders--Text Revision* at 34 (*DSM-IV-TR*)(4th ed. 2000). A GAF score of 51-60 indicates moderate symptoms (occasional panic attacks) or moderate difficulty in social, occupational, or school functioning. *Id.*

[2]

A GAF score of 41-50 indicates "[s]erious symptoms ... [or] serious impairment in

the same month, Plaintiff denied that she was having a manic episode at the time of her recent hospitalization, stating that she became angry after a family dispute and needed "fresh air," noting that she was wearing pants and a coat at the time she attempted to leave the house (Tr. 298). She denied racing thoughts or problems sleeping (Tr. 298). Treating notes state that Plaintiff experienced mild impairment in activities of daily living and moderate impairments in social functioning and concentration (Tr. 307). Her ability to adapt to change was deemed extremely limited (Tr. 307).

In July, 2007, Plaintiff stated that she was eating and sleeping well and denied medication side effects (Tr. 290). The following month, Plaintiff was told to modify her psychotropic medication dosage (Tr. 291). In September, 2007, Plaintiff's parents sought emergency treatment for her after she stopped taking psychotropic medicine (Tr. 285). Plaintiff was screaming and unresponsive to treating staff suggestions (Tr. 285). The following month, Plaintiff reported that she was doing well on her current medication regime but felt that the medication was "sedating" (Tr. 293). In November, 2007, Plaintiff reported that she was doing well but that work was "overwhelming" because a new manager did not like her (Tr. 295). Plaintiff reported that she was sleeping well and experienced stable moods with Seroquel and Trileptal (Tr. 295). In December, 2007, Plaintiff exhibited "excellent

---

social, occupational, or school functioning," such as inability to keep a job. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* at 34 (*DSM-IV-TR* )(4th ed.2000). A GAF score of 11-20 indicates some danger of hurting self or others OR occasionally fails to maintain minimal personal hygiene OR gross impairment in communication. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders--Text Revision* at 34 (*DSM-IV-TR*)(4th ed. 2000).

interview skills" in applying for work with a job placement service (Tr. 316).

January, 2008 treating notes state that Plaintiff had been fired from her old job at the end of December, but was looking for a new job (Tr. 296). In March, 2008, Plaintiff stated that her mood was "fine" and denied any symptoms (Tr. 297). Plaintiff's mother indicated that she did not think Plaintiff was independent enough to leave home (Tr. 297). December, 2008 treating notes state that Plaintiff was well groomed, with an intact thought process and a flat affect (Tr. 384). She was deemed "resistant to therapy" (Tr. 380).

In January, 2009, treatment notes state that Plaintiff voiced objections to current treatment (Tr. 397). In March, 2009, Plaintiff opined that therapy was not beneficial and that her angry outbursts were part of her personality rather than the result of a psychiatric condition (Tr. 370). The same month, Plaintiff reported to psychiatrist A. Shah, M.D. that she was doing well (Tr. 367). She stated that she had a boyfriend and was sexually active, but using birth control (Tr. 368). Dr. Shah assigned her a GAF of 55 (Tr. 369).

In April, 2009, Plaintiff, indicating that she was not compliant with medications, disputed treating records stating that she had missed seven counseling sessions (Tr. 365). Treating notes state that Plaintiff said that she did not believe that counseling was helping her and that she was only participating to obtain medication and to qualify for SSI (Tr. 365). May and June, 2009 therapy notes state that Plaintiff was driving her boyfriend's car regularly without a license (Tr. 360-361). Treating notes indicate that in June, 2009, Plaintiff's stepfather gave her an eviction notice (Tr. 359). Plaintiff reported to a treating source that she shared the news of her impending eviction with her boyfriend (Tr. 368).

Subsequent notes state that Plaintiff's mother interceded on Plaintiff's behalf to prevent the eviction (Tr. 356). Plaintiff reported that she and her boyfriend were looking for a place to live (Tr. 356). In July and August, 2009, Plaintiff stated that she believed that she was on the correct amount of medication and was obtaining a normal night's sleep (Tr. 354). In October, 2009, Plaintiff voiced a disinclination to change mental health care clinics (Tr. 339). She was deemed a non-risk to herself or others (Tr. 340). Plaintiff reported that she was taking her medication and sleeping 14 to 15 hours each day, but the following month denied sleeping excessively (Tr. 341, 373). Her therapist discussed strategies for obtaining employment (Tr. 371). In November, 2009, Dr. Shah completed a Mental Residual Functional Capacity Assessment on Plaintiff's behalf, finding that she experienced marked limitations in understanding and memory; sustained concentration and persistence; social interaction; and adaptation (Tr. 399).

### 2.  Non-Treating Sources

In March, 2008, David L. Hayter, Ph.D. conducted a consultive examination of Plaintiff on behalf of the SSA (Tr. 416-417). Noting Plaintiff's medication and history of hospitalizations, Hayter observed that Plaintiff was fully oriented but demonstrated some level of concentrational deficiency (Tr. 420). She was fully oriented but exhibited a sullen mood (Tr. 419). Hayter assigned her a GAF of 50 (Tr. 521). In July, 2008, Sung-Ran Cho, M.D. also performed a psychiatric consultive examination of Plaintiff on behalf of the SSA (Tr. 317-320). Dr. Cho noted Plaintiff's history of psychiatric hospitalizations (Tr. 317).

Plaintiff reported good relations with household members and that she had one close friend (Tr. 318).  She denied interests or hobbies (Tr. 318).  Plaintiff stated that she arose at 4:00 or 5:00 p.m. and retired at 3:00 or 4:00 a.m. (Tr. 318).  She indicated that she argued with her mother about performing chores (Tr. 318).  Dr. Cho noted that Plaintiff was neatly dressed, polite, and "in good contact with reality" (Tr. 318).  Plaintiff's mother reported that when Plaintiff was on medication, she was not combative, but did not show any motivation (Tr. 319).  Plaintiff exhibited normal immediate, recent, and past memory (Tr. 319).  She alleged that she was unable to subtract "serial 7's from 100" (Tr. 320).  Dr. Cho assigned Plaintiff a GAF of 45, deeming her prognosis "poor"[3]  (Tr. 320).

The same month, Kokila Sheth, M.D. performed a non-examining Psychiatric Review Technique Assessment of the treating and consultive records, finding the presence of affective (bipolar syndrome) and personality disorders (Tr. 321, 324, 328).  Under the "'B' Criteria," Dr. Sheth found that Plaintiff experienced mild restrictions in daily living and moderate difficulties in social functioning and maintaining concentration, persistence, or pace with "one or two" episodes of decompensation since the alleged onset of disability (Tr. 331).  Dr. Sheth concluded that Plaintiff could perform "simple unskilled work" on a sustained basis "under supervision" (Tr. 333).  Dr. Sheth also completed a Mental Residual Functional Capacity Assessment, finding that Plaintiff was moderately limited in the ability to maintain attention for extended periods, accept instruction, respond appropriately to

---

[3]Dr. Cho's description of the hospitalizations appears to conflate Plaintiff's December, 2007 job termination with an April, 2007 hospitalization (Tr. 270, 319).

criticism, and respond appropriately to workplace changes (Tr. 335-336).

### 3.  Material Submitted Subsequent to the Administrative Decision

In February, 2011, Dr. Shah stated that in November, 2009, he had found that Plaintiff experienced "marked" limitations in 20 out of 20 areas of functioning due to "unpredictable mood swings," hospitalizations, and Plaintiff's lack of forthcomingness in addressing her symptoms (Tr. 423-424).

### D.      Vocational Expert Testimony

VE Diane Regan testified that if Plaintiff were limited to medium exertional duties and "simple unskilled, [Specific Vocational Preparation] one or two jobs, no public contact work and no more than superficial contact with supervisors, co-employees and the general public," she would be unable to perform her past relevant work as a cashier but could work as a packer (12,000 positions in the regional economy); punch press operator (16,000); and cleaner (4,100) (Tr. 54).

### E.      The ALJ's Decision

Citing Plaintiff's treating records, ALJ Armstrong found that Plaintiff experienced the severe impairments of bipolar disorder, oppositional-defiant disorder and a personality disorder, but that none of the impairments met or equaled a listed impairment under 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 78-79).  He found that Plaintiff experienced only mild restriction in activities of daily living but moderate deficiencies in social functioning and concentration, persistence, or pace (Tr. 79).  He noted that a July, 2003 psychiatric

hospitalization qualified as "an episode of decompensation," but predated the alleged onset of disability date (Tr. 79). He found that Plaintiff retained the Residual Functional Capacity ("RFC") for exertionally medium work limited to "simple, unskilled work only" and "no work requiring public contact or more than superficial contact with supervisors and co-workers" (Tr. 80). Citing the VE's findings, ALJ Armstrong found that Plaintiff could perform the work of a packer, punch press operator, and cleaner (Tr. 87).

The ALJ discounted Plaintiff's allegations of disability, citing treating notes showing that although she later claimed that Seroquel and Trileptal made her too sleepy to work, she had reported no "adverse side effects" in May, 2005 from either medication (Tr. 82). He observed that her mental condition was stable (Tr. 82). The ALJ noted that a high school suicide attempt was precipitated by the breakup of a romantic relationship, finding in effect, that her symptomology was partially attributable to situational stressors (Tr. 82). The ALJ remarked that Plaintiff's testimony that she was unable to perform any work was undermined by the fact that she had interviewed at a job placement service in January, 2008 (Tr. 83).

## **STANDARD OF REVIEW**

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence. 42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence is more than a scintilla but less that a preponderance. It is "such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,*  800 F.2d 535, 545 (6th Cir. 1986)(en banc).  In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy. 20 C.F.R. §416.920(a).  The Plaintiff has

the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## ANALYSIS

Plaintiff makes four arguments in favor of remand.  She argues first that the ALJ erred by declining to adopt Dr. Shah's November, 2009 finding of marked limitations.  *Plaintiff's Brief* at 3-7.  Next, she contends that the ALJ overlooked her side effect of drowsiness as a result of Trileptal and Seroquel use.  *Id.* at 7-9.  Third, she argues that her psychological impairments mandated a finding of disability at Step Three of the administrative sequence. *Id.* at 9-11.  Finally, Plaintiff, noting that the ALJ's hypothetical question to the VE was based on Dr. Sheth's findings, argues that the failure to include *all* of Dr. Sheth's findings in the hypothetical question invalidates the VE's job responses.  *Id.* at 11-12.

### A.  The Treating Physician Analysis

 Plaintiff argues that Dr. Shah's finding that she consistently experienced marked psychological deficiencies in 20 separate categories of functioning ought to have been adopted.  *Plaintiff's Brief* at 4 (citing Tr. 398-399).  Citing *Cole v. Commissioner of Social Security,* 661 F.3d 931, 937 (6th Cir. 2011), she contends that the ALJ did not provide sufficient reasons for discounting Dr. Shah's findings.  *Plaintiff's Brief* at 4.

Plaintiff is correct that an uncontradicted, well supported treating source opinion "must be given controlling weight." *Hensley v. Astrue,* 573 F.3d 263, 266 (6th Cir.2009)

(citing *Wilson v. Commissioner of Social Sec.,* 378 F.3d 541, 544 (6th Cir.2004)(internal quotation marks omitted)).   However,  Dr. Shah's finding of  marked psychological limitations is contradicted by other portions of the record.[4]  The ALJ noted that Dr. Shah's November, 2009 assessment contradicted his own treating notes stating that Plaintiff was doing well (Tr. 83).  In rejecting Dr. Shah's opinion, the ALJ also cited earlier psychological records stating that Plaintiff exhibited a stable mood, good memory, and appropriate behavior and that her condition was stable while taking Seroquel and Trileptal (Tr. 82).  The ALJ also noted that in April, 2007, Plaintiff was described as "pleasant" but not motivated to seek treatment (Tr. 83).  Acknowledging Plaintiff's brief hospitalizations in April and September, 2007, the ALJ observed that she repeatedly denied medication side effects or significant psychological symptoms once her medication dosage was adjusted (Tr. 83, 290, 295, 354).

Plaintiff is also correct that in rejecting the physician's opinion, the ALJ is required discuss the nature of the treating relationship.  "If the opinion of a treating source is not accorded controlling weight, an ALJ must apply certain factors namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the

---

[4]

The Psychiatric Review Technique terminology defines a *marked* limitation  as one which "may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with your ability to function independently, appropriately, effectively, and on a sustained basis." 20 CFR Pt. 404, Subpt. P, App. 1.  A marked impairment in social functioning in "work situations" would typically affect "interactions with the public, responding appropriately to persons in authority (e.g., supervisors), or cooperative behaviors involving coworkers."20 CFR Pt. 404, Subpt. P, App. 1.

treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source-in determining what weight to give the opinion." *Wilson,* 378 F.3d at 544; 20 C.F.R. 1527(d)(2).  However, contrary to Plaintiff's argument that the ALJ did not consider these factors, the administrative analysis included discussion of the length and nature of the treating relationship, Dr. Shah's specialty, and the record evidence contradicting the November, 2009 assessment (Tr. 84).

Likewise, I disagree that the ALJ failed to provide sufficient "good reasons" for discounting Dr. Shah's opinion.  Again, the ALJ noted that the November, 2009 assessment was "not explained at all, and directly contradict[ed]" the psychiatrist's March, 2009 finding that Plaintiff experienced only moderate symptoms of psychological limitation (Tr. 84-85, 369).  While Plaintiff cites a February, 2011 "addendum" to the November, 2009 assessment in which Dr. Shah  "explains" his earlier findings, this material was submitted long after the March 18, 2010 administrative decision and is not properly before this Court.[5]  Finally,

---

[5]

Material submitted to the Appeals Council subsequent to the administrative decision is subject to a narrow review by the district court. *Cotton v. Sullivan,* 2 F.3d 692, 696 (6th Cir.1993). Where the Appeals Council denies a claimant's request for a review of his application based on new material, the district court cannot consider that new evidence in deciding whether to "uphold, modify, or reverse the ALJ's decision." *Id.* at 695–96. Sentence Six of 42 U.S.C. § 405(g) states that the court "may at any time order additional evidence to be taken before the Commissioner of Social Security, but *only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding* ..." (emphasis added). Hence, this Court may consider the additional evidence only for purposes of determining whether remand is appropriate under the sixth sentence of § 405(g).

First, Plaintiff does not request a Sentence Six remand. Second, she has not provided good cause for the late submission of this evidence.  In fact, it appears that it was improperly submitted as a rebuttal to the ALJ's rejection of Dr. Shah's opinion. "[G]ood cause

-15-

although Plaintiff argues that the ALJ gave short shrift to the treating records supporting Dr. Shah's evaluation and placed exaggerated weight to records supporting the opposite conclusion, the treating physician analysis, well supported and explained, does not provide grounds for remand.

## B. Medication Side Effects

Plaintiff argues next that the ALJ impermissibly discounted her claims of the medication side effects of sleepiness and restlessness. *Plaintiff's Brief* at 7-9. She notes that the side effects of both Trileptal and Seroquel are well documented. *Id., Plaintiff's Exhibits 2-3.*

In performing the credibility analysis required by SSR 96-7p, the ALJ must consider "[t]he type, dosage, effectiveness, and side effects of any medication" taken to alleviate symptoms; C.F.R. 404.1529(c)(3), 416.929(c)(3)(iv). Plaintiff does not argue that the ALJ failed to discuss her medications or their possible side effects in the administrative opinion. Rather, she contends that the ALJ erred by discounting her testimony that the side effects of sleepiness and restlessness prevented her from performing any work. *Plaintiff's Brief* at 7-9 (citing Tr. 34).

---

contemplates more than strategic delay, or sandbagging, of evidence and more than simple miscalculation of the necessity of producing such evidence in the first instance to establish a claim of disability." *Haney v. Astrue,* 2009 WL 700057, *6 (W.D.Ky.2009) (citing *Thomas v. Secretary,* 928 F.2d 255, 260 (8th Cir., 1991)). Moreover, because Dr. Shah's February, 2011 statement does not reconcile his November, 2009 "marked" limitations assessment with earlier treating notes suggesting a lesser degree of impairment, it would be unlikely to change the ALJ's original findings.

-16-

However, the determination that Plaintiff's "side effect" testimony was not credible was within the purview of the ALJ's discretion and should not be disturbed. "[A]n ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility.'" *Cruse v. Commissioner of Social Sec.,* 502 F.3d 532, 542 (6th Cir.2007)(citing *Walters v. Commissioner of Social Sec.,* 127 F.3d 525, 531 (6th Cir.1997)). The ALJ noted that Plaintiff's claim of debilitating side effects was contradicted by her own statements to treating sources (Tr. 82, 85 290, 295, 354). The ALJ also noted that Plaintiff alleged inability to work stood at odds with her ability to hold jobs at fast food restaurants and a clothing store (Tr. 85). He reasonably observed that Plaintiff's job termination as a result of failing to fill an order and allowing a customer to leave without paying for merchandise, as discussed at the hearing, were unrelated to either mental impairments or medication side effects (Tr. 85). "Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence." *Walters,* at 531. *See also Casey v. Secretary of Health and Human Services,* 987 F.2d 1230, 1234 (6th Cir.1993). The ALJ's credibility determination is also supported by treating records showing that although Plaintiff's dosage of medication was adjusted on several occasions between 2004 and 2009, she reported good results and denied side effects following the adjustments (Tr. 247, 249, 290, 295, 354).

Further, the treating records as a whole furnish ample grounds for discounting Plaintiff's testimony. At the hearing, Plaintiff claimed that she was socially isolated, denying

-17-

that she had had a boyfriend since high school because she felt stigmatized by her bipolar disorder (Tr. 26-27).  When directly questioned about her social history, she characterized an individual referred to as a boyfriend in her recent treating records as a platonic friend (Tr. 27).  However, Plaintiff's account of the relationship to multiple treating sources (describing a current relationship bearing obvious hallmarks of a long-term, romantic interaction) flatly contradicts her hearing testimony (Tr. 356, 360-361, 368).  Although Plaintiff presented as "sullen," "anxious" and "irritable" at key consultive examinations related to her application for disability benefits (Tr. 319, 419) she showed "excellent interview skills" with a job placement service (Tr. 316).  She told a counselor in April, 2009 that she attended therapy only to obtain medication and further her  quest for SSI benefits (Tr. 365).  Because the credibility determination is well explained and supported, remand on this basis is not warranted.

### C.  Disability Under the Listings

Plaintiff argues that she experiences marked limitations in social functioning, activities of daily living, and concentration, persistence or pace, contending that as such, the ALJ erred by failing to find her disabled under Social Security Listing 12.04 at Step Three of the administrative analysis.  *Plaintiff's Brief* at 9-11.

Listing 20 C.F.R. part 404, Subpart P, Appendix 1, 12.04 states in pertinent part ("'A' Criteria"):

> *Affective Disorders:* Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either

depression or elation.
  A. Medically documented persistence, either continuous or intermittent, of one of the following:
1. Depressive syndrome characterized by at least four of the following:
a. Anhedonia or pervasive loss of interest in almost all activities; or
b. Appetite disturbance with change in weight or
c. Sleep disturbance; or
d. Psychomotor agitation or retardation; or
e. Decreased energy; or
f. Feelings of guilt or worthlessness; or
g. Difficulty concentrating or thinking; or
h. Thoughts of suicide; or
i. Hallucinations, delusions or paranoid thinking.

Assuming that Plaintiff meets one or more of the above symptoms, she must also show

(under the "'B' Criteria") that the condition results in at least two of the following:

1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. [marked] Deficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner (in work settings or elsewhere); or
4. Repeated episodes of deterioration or decompensation in work or work-like settings which cause the individual to withdraw from that situation or to experience exacerbation of signs and symptoms (which may include deterioration of adaptive behaviors).

*or* (under the "'C' Criteria):

 "repeated episodes of compensation," [or]a disease process in which "even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate," or "a current history of 1 or more years' inability to function outside a highly supportive living arrangement . . ."

Plaintiff relies on Dr. Shah's November, 2009 finding of marked limitations in

concentration, social interaction, and adaption to support the contention that she experiences

at least two marked limitations under the "'B' Criteria" (Tr. 398-399). However, as noted

-19-

above, substantial evidence supports the ALJ's well explained rejection of Dr. Shah's assessment in favor of Dr. Sheth's finding of *mild* restrictions in daily living and *moderate* difficulties in social functioning and maintaining concentration, persistence, and pace (Tr. 79, 82, 331).   The ALJ acknowledged that Plaintiff's July, 2003 hospitalizations could qualify as "an episode of decompensation," but noted that those events had occurred before the alleged onset date of August 26, 2003 (Tr. 79).

Likewise, while Plaintiff asserts that medication side effects caused marked functional limitations, the ALJ discussed his reasons for discounting those allegation, again noting that Plaintiff's claims of marked limitation were contradicted by the treating records (Tr. 85).   Plaintiff's related contention that her intermittently low GAF scores establish marked limitations is unavailing.   "A GAF score represents a 'snapshot' of a person's 'overall psychological functioning' at or near the time of the evaluation." *Hedger v. Astrue* 2012 WL 468546, *9  (S.D.Ohio 2012)(citing *Martin v. Commissioner,* 61 F. App'x 191, 194 n. 2 (6th Cir.2003))  "As such, a GAF assessment is isolated to a relatively brief period of time, rather than being significantly probative of a person's ability to perform mental work activities on a full-time basis." *Hedger,* at *9 (citing *Arnold v. Astrue,* No. 10–cv–13, 2010 WL 5812957, *8 (S.D.Ohio); *See also Kornecky v. Commissioner of Social Security,* 167 Fed.Appx. 496, 511, 2006 WL 305648, *14 (6th Cir. 2006)("[W]e are not aware of any statutory, regulatory, or other authority requiring the ALJ to put stock in a GAF score in the first place."); *Howard v. Comm'r of Soc. Sec.,* 276 F.3d 235, 241 (6th Cir.2002).  I find no reversible error in the ALJ's Step Three determination.

-20-

### D.  The VE's Testimony

Last, Plaintiff argues that even assuming that the ALJ did not err in adopting Dr. Sheth's non-examining findings over Dr. Shah's opinion, the hypothetical question to the VE did not account for *all* of Dr. Sheth's findings.[6]  *Plaintiff's Brief* at 11-12.  Specifically, Plaintiff argues that although Dr. Sheth stated that she could perform "simple unskilled work" on a sustained basis "under supervision" (Tr. 333), the hypothetical question to the VE did not include the "under supervision" limitation (Tr. 54).  Plaintiff also revisits her argument that Dr. Shah's November, 2009 finding of marked limitations ought to have been included in the hypothetical limitations posed to the VE.  *Plaintiff's Brief* at 12.  She argues generally that the exclusion of key impairments from the hypothetical question invalidates the VE's job testimony.  *Id.*

A hypothetical question constitutes substantial evidence only if it accurately portrays the individual's physical and mental impairments.  *Varley v. Commissioner of Health and Human Services,* 820 F.2d 777, 779 (6th Cir. 1987).  While the Sixth Circuit has  rejected the proposition that all of the claimant's maladies must be listed verbatim, "[t]he hypothetical question . . . should include an accurate portrayal of [a claimant's] individual physical and mental impairments."  *Webb v. Commissioner of Social Sec.* 368 F.3d 629, 632 (6th Cir. 2004).

Substantial evidence supports the ALJ's inclusion of some of Dr. Sheth's findings

---

[6]The discussion of the VE's testimony is limited to the issues raised by Plaintiff. *United States v. Campbell,* 279 F.3d 392, 401 (6th Cir.2002).

and the exclusion of others.   Although the ALJ adopted Dr. Sheth's findings regarding limitations in daily activities, social functioning, and concentration, he did not purport to accept the non-examining evaluation in its entirety and was under no obligation to do so. The ALJ stated that while Dr. Sheth's findings were entitled to "substantial weight," he stated that also relied on "records not available to Dr. Sheth . . ." (Tr. 82).  As such, while the ALJ permissibly chose to omit Dr. Sheth's "under supervision" finding from the hypothetical question, he included additional limitations not found in Dr. Sheth's conclusion, including  Specific Vocational Preparation ("SVP") one and two jobs  and "no public contact with supervisors, co-employees and the general public" (Tr. 54).  Likewise, having discounted Dr. Shah's finding of marked limitations in the treating physician analysis, he was not required to include that rejected finding in either the hypothetical question or the RFC.  *Stanley v. Secretary of Health and Human Services,* 39 F.3d 115, 118-119 (6th Cir.1994)(ALJ not obliged to include discredited findings in the hypothetical question).

In closing, I recognize that Ms. Daniel experiences limitations as a result psychological problems, and this Recommendation should not be read to trivialize those problems. Clearly, she faces challenges in finding and maintaining employment. But this is not *de novo* review, and under the "substantial evidence" standard, I find no error in the ALJ's exhaustive discussion of Plaintiff's testimony and the treating records.   Based on a review of this record, the ALJ's decision falls within the "zone of choice" accorded to the fact-finder at the administrative hearing level and should not be disturbed by this Court.

*Mullen v. Bowen*, *supra*.

## CONCLUSION

For the reasons stated above, I recommend  that Defendant's Motion for Summary Judgment [Doc. #13] be GRANTED and that Plaintiff's Motion for Summary Judgment [Doc. #10] be DENIED.

Any objections to this  Report and Recommendation must be filed  within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Issue first raised in objections to a magistrate judge's report and recommendation are deemed waived. *U.S. v. Waters,* 158 F.3d 933, 936 (6th Cir. 1998). Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir.  1981).  Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir.  1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir.  1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within 14 days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than 20 pages in length unless by motion and order such page limit is extended by the court.  The response shall

address specifically, and in the same order raised, each issue contained within the objections.

s/ R. Steven Whalen
R. STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE

Date: August 7, 2012

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record via the Court's ECF System to their respective email addresses or First Class U.S. mail disclosed on the Notice of Electronic Filing on August 7, 2012.

s/Johnetta M. Curry-Williams
Case Manager